1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DELVOND BROWN,

          Petitioner,

    v.

G. D. LEWIS,

          Respondent.

Case No.  12-cv-02198-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Petitioner Delvond Brown seeks federal habeas relief from his state convictions because (1) the admission of his redacted statements violated his right to due process; (2) the admission of evidence of an uncharged homicide violated due process; (3) the prosecutor struck potential jurors for unconstitutional reasons; and (4) the prosecutor committed misconduct by allowing a witness to commit perjury.  None of these claims has merit and, for the reasons set forth below, the petition for such relief is DENIED.

**BACKGROUND**

      In 2007, an Alameda County Superior Court jury found petitioner Brown, along with co-defendants Rowmond Brown (petitioner's brother), Erick Ray Richardson, and Robert Rubio, guilty of the first degree murder of Thomas Anderson, who was felled by gunfire on September 2, 2003.  (Ans., Ex. L at 12-13 (State Appellate Opinion, *People*

*v. Brown, et al.*, No. A118569, 2011 WL 1197465 (Cal. Ct. App. Mar. 30, 2011) (unpublished).)  The jury determined that Richardson alone was the shooter who caused Anderson's death.  (*Id.* at 13.)

Another man, Michael Thompson, was shot the same day as Anderson.  Bullets and casings from the Thompson murder matched those used in the Anderson killing.  (*Id.* at 7.) Brown admitted to police that he was present at the Thompson shooting.  (*Id.* at 9; Am. Pet. at *x*, 32.)  Though the defendants were not charged with Thompson's murder, the prosecution presented evidence of the crime at trial.

Brown received a sentence of 35 years-to-life in state prison for his convictions for first degree murder and the personal use of a firearm.  (Ans., Ex. L at 13.)  He sought to overturn his conviction through the state courts, but was unsuccessful.[1]  This federal habeas petition followed.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

---

[1] The state appellate court ordered the correction of the abstract of judgment so that it would accurately convey the sentences imposed by the trial court.  (Ans., Ex. L at 57.)

United States District Court
Northern District of California

1   materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13

2   (2000).

3          "Under the 'unreasonable application' clause, a federal habeas court may grant the

4   writ if the state court identifies the correct governing legal principle from [the] Court's

5   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at

6   413. "[A] federal habeas court may not issue the writ simply because that court concludes

7   in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly. Rather, that application must also be

9   unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application"

10  inquiry should ask whether the state court's application of clearly established federal law

11  was "objectively unreasonable." *Id.* at 409.

12         When presented with a state court decision that is unaccompanied by a rationale for

13  its conclusions, a federal court must conduct an independent review of the record to

14  determine whether the state-court decision is objectively reasonable. *See Delgado v.*

15  *Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review is not a *de novo*

16  review of the constitutional issue, but rather, the only method by which [a federal court]

17  can determine whether a silent state court decision is objectively unreasonable." *See*

18  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "[W]here a state court's decision

19  is unaccompanied by an explanation, the habeas petitioner's burden still must be met by

20  showing there was no reasonable basis for the state court to deny relief." *See Harrington*

21  *v. Richter*, 131 S. Ct. 770, 784 (2011).

22                                          **DISCUSSION**

23  **I.      Admission of Redacted Statements**

24         Brown was interviewed by police about the Anderson shooting. He claims here that

25  the admission of a redacted version of his statements to police violated his right to due

26  process. The state appellate court summarized the relevant facts as follows:

27         Various statements were omitted from Delvond Brown's interview with

28         Sergeants Ferguson and Galindo in the early morning hours of November 6,

3

United States District Court
Northern District of California

2003.  These include his statements that he was the first one to get out of the car, that when he got back in the car after Anderson was shot he did not see a gun, that he was telling Row[mond Brown] to drop him off, that he 'didn't want to be associated with those guys in my brother's car,' that he was the first to get out of the car after the shooting, that when he heard gunshots, he figured they had done something stupid, that what 'they' did to Anderson was wrong, [FN24] and that neither [Richardson] nor Rob [Rubio] had ever said they were sorry, as well as various other references to his codefendants by name.

FN24.  Ferguson testified that [Brown] told him that 'what was done to Thomas' was wrong.

In the taped statement Delvond Brown made at almost 5:00 a.m. on the same morning . . . he discussed the killing of Anderson.  Ferguson asked him whether he had been in the turquoise car when 'you guys' went to 48th and Vicksburg [where Anderson was shot].  This question was redacted to omit the word 'guys.'  An exchange in which [Brown] said that before the group went to the detail shop, they had been together, that they had been in a car but that 'none of us was driving,' that they then rode around town, and that they ended up at 48th and Vicksburg, was omitted, as was [Brown]'s reference to wanting to fight Anderson because Anderson had put out word about wanting to kill [Brown]'s brother over 'the little Deron thing,' presumably a reference to Rowmond [Brown]'s testimony against Deron Kincaid.  A question about whether 'any of the other guys' got out of the car with him was redacted to ask only, 'Were you by yourself?'

In an omitted portion of the interview, [Brown] said that the turquoise car made a U-turn and came back to where he and [witness Antione Dickerson] were talking, that somebody must have gotten out, but that [Brown] did not see who because his back was turned, and that he then heard gunshots.  The jury heard [Brown] say he took cover and turned around after all the shots were fired, but did not hear him say he could not recall who was in the front or back seat, that he did not see any of the people inside the car with a gun 'at the time,' or that he did not see a gun in the back seat.  In omitted portions, [Brown] said he got into the back seat, that as they drove the others 'wasn't acting really nothing,' that he asked the others what was going on, and that he kept yelling to be dropped off; when asked why he said, 'Because.  Hell-a shit just happened.  A lot of stuff, excuse me for cussing, but alot of stuff had just happened you feel me and man.'  (*Sic*.) Asked in the omitted portion, 'You just wanted to get out of there?' he said, 'I had to get up out of that car.  I had to get up out of there.'  An exchange in which he was asked how 'you guys' were driving, and he said they were zigzagging, and said no one was waving guns was omitted.  The jury heard [Brown] agree that when he got out and 'started to get at [Anderson],

4

[Antione Dickerson] kind of stopped it,' and that he spoke aggressively to Anderson and wanted a 'regular fight' with him, but did not hear him tell the officers that after the car made a U-turn, people from the car got out and he soon heard gunshots, and that his back was turned and he did not see the people.

Several statements [Brown] made in the unrecorded interview at 6:00 a.m. the same morning, discussing the killing of Thompson, were redacted, including his statements that [Rubio] was sitting in the left rear seat, that [Richardson] was in the front seat, that [Brown]'s brother was in the 'back, back,' that Kevin [the driver] was not shooting, that [Richardson] had a .380 and was shooting, and that little Rob [Rubio] had a nine-millimeter gun that shot .380 caliber bullets, and that he didn't think 'they' were going to kill someone.

In the taped statement [Brown] made at approximately 10:15 a.m. the same morning discussing the killing of Thompson, references to other people in the car were omitted, including an exchange in which [Brown] agreed that at some point 'you guys' had met up with 'a car that some people in your car thought was a problem so they shot it up.'  The jury heard [Brown] explain that he did not recognize the burgundy car or its driver, that he was in the back seat, and that 'by the time they get up there I see guns . . .'  It did not hear him explain that 'folks' started shooting the occupants of the burgundy car within seconds of stopping alongside them, and that the people in the car [Brown] was in 'took matters in they own hands basically' and started shooting.  The jury heard [Brown] say Kevin, the driver, did not do any shooting, and later heard him say 'he' was shooting out the left window.  It also heard him explain that he could not recall 'what all they was sayin'' as they drove after the shooting, and discuss 'what problems the people in [his] car had with the people in that burgundy car.' The jury did not hear an exchange in which [Brown] was asked whether he had found out what happened to the guns after the shooting, and he said he thought 'they' had probably thrown them away, or an exchange in which he said there were only two guns in the car.

(Ans., Ex. L at 25-28.)  On appeal, Brown contended that the omissions resulted in prejudice:

As to his statements about the killing of Anderson, [Brown] contends that he was prejudiced by the omission of various matters, including his statements about his motive for wanting to fight Anderson; that he figured the others in the turquoise car had done something stupid; that he told Rowmond to drop him off because he did not want to be associated with those guys; that what 'they' had done was wrong; and that neither Richardson nor Rubio had said he was sorry.  According to [Brown], these

5

redactions suggested that he had a gun, because two guns were involved in the crime and only [Brown] and the driver of the car were directly mentioned.  He also argues that the redactions made the incident seem like a motiveless and irrational attack, and omitted his expression of outrage at what Richardson and Rubio had done.

(*Id.* at 30-31.)

The state appellate court rejected Brown's claim because "the redactions did not distort the meaning of [his] statements or suggest he was not telling the truth," (*id.* at 33), nor were his statements "distorted to imply he had admitted participating in the shooting of either Thompson or Anderson," *id.*:

In our view, the redactions do not distort [Brown]'s statements in this manner. As redacted, the statements made clear [Brown]'s position that he intended only to fight Anderson, that he did not have a gun with him when he got out of the car, that the gunshots started before he got close to Anderson, that [Brown] heard gunshots and took cover, that the gunshots came from where Anderson was, that what was done to Anderson was wrong, and that [Brown] thought the others were 'crazy.' The redacted statements did not give the jury the impression [Brown] either shot Anderson or intended his death.

[Brown] also argues that the redactions to his statements about the killing of Thompson to eliminate his mention of [Richardson] and [Rubio] gave a false impression that the only people in the station wagon were himself and Kevin [the driver], and suggested both that he was one of the people who had problems with the people in the burgundy car and that he was one of the two gunmen. A fair reading of the redacted statements does not support this contention, and makes clear that [Brown] and Kevin were not the only people in the station wagon.  In a redacted recorded statement heard by the jury, [Brown] said Kev had picked him up, that he got in the car, and that '[t]hey was comin' to get me.'  [Brown] said that when they pulled up next to the car Thompson was in, he saw his friend on his side and asked him what was up.  He said he 'was like what the hell's going on,' because he was in the back seat, 'high,' and 'by the time we get up there I see guns and shit.' [Brown] was asked what 'people' in the car said as they drove on, and he said that he 'really can't recall what all they was sayin'.'

(*Id.* at 31-32.)

Habeas relief is not warranted here.  The state appellate court reasonably determined that Brown's defense was not injured by the redactions, and that no due

process violation occurred.  The jury heard the very information Brown believes crucial to his defense — he meant to fight, not kill, Anderson; he did not have a gun when he stepped out of the car; the shots started before he got close to Anderson; he took cover from the gunfire; the shots came from Anderson's location; he thought shooting Anderson was wrong; and that he thought his co-defendants were "crazy."  The jury then heard what Brown wanted, that he did not shoot Anderson nor intend his death.  Nothing in the redactions erodes, diminishes, or distorts in any perceptible way this defense, nor has Brown shown such an effect.  Therefore, this Court cannot say that the state appellate court's decision was unreasonable.  Such decision is entitled to AEDPA deference.  This claim is DENIED.

## II.    Admission of the Uncharged Homicide

As noted above, the prosecution presented evidence of the murder of Michael Thompson, who was shot and killed the same day as Anderson.  As noted above, Brown admitted to police that he was in the car when a fellow passenger shot Thompson.  (Ans., Ex. L at 9.)  Brown claims that admission of the Thompson evidence was prejudicial and constituted improper character or propensity evidence.  The state appellate court rejected the claim on grounds that the evidence was properly admitted to show identity.[2]  (*Id.* at 43.)

Habeas relief is not warranted here because no remediable constitutional violation occurred.  A federal habeas petitioner's due process right concerning the admission of propensity evidence is not clearly established for purposes of review under AEDPA, the Supreme Court having reserved this as an open question.  *Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006).  Brown's related contention that the prejudicial effect of the evidence outweighed its probative value also fails.  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

_____

[2] The appellate court concluded that it was error to admit this evidence against Robertson and Rubio because there was no evidence tying them to the Thompson shooting.  That error was found harmless.  (Ans., Ex. L at 43–44.)

1    process violation." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  This

2    claim is DENIED.

3          Further, the admission of evidence is not subject to federal review unless a specific

4    constitutional guarantee is violated or the error is of such magnitude that the result is a

5    denial of the fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d 1021, 1031

6    (9th Cir. 1999).  Only if there are no permissible inferences that the jury may draw from

7    the evidence can its admission violate due process.  *Jammal v. Van de Kamp*, 926 F.2d

8    918, 920 (9th Cir. 1991).

9          Here, both killings happened on the same day, the same two guns were used in both,

10   and Brown admitted that he was present when the shooting occurred.  From such evidence,

11   the jury could draw permissible inferences regarding the identity of the perpetrators.  The

12   state appellate court summarized this conclusion:

13         Both Delvond [Brown] and Rowmond [Brown] took the position in their
           statements that they were mere observers of events at both 90th Avenue and
14         48th Avenue.  However, the fact that each brother had been present at the
           shooting of Thompson two hours before Anderson was gunned down in
15         similar circumstances, with the same guns, could indicate that the two
           killings were part of a common plan or scheme.  This evidence could tend
16         to show that [the Brown brothers] were willing participants in the charged
17         killing of Anderson and not the victims of an extraordinary coincidence.

18   (Ans., Ex. L at 43.)

19         Because the state appellate court's rejection of petitioner's claim was reasonable,

20   and therefore is entitled to AEDPA deference, this claim is DENIED.

21   **III.    Exclusion of Jurors**

22         Brown claims that the prosecution's exclusion of three African–Americans from his

23   jury violated the Equal Protection Clause.  The state appellate court summarized the facts

24   as follows:

25         Defense counsel raised no objection to the prosecutor's first excusal of an
26         African–American juror, C.D.  The prosecutor excused three other African–
27         American jurors, K.H., F.P, and A.C., and on each occasion, a motion was
           made under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v.*
28

8

*Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).[3]  [Footnote omitted.]

At the hearing on the *Batson/Wheeler* motions, Delvond Brown's counsel argued that the prosecutor had systematically excluded African–American jurors.  K.H., he argued, was well-qualified and intelligent; F.P. was able to view the evidence in a balanced manner, and A.C. had worked within the system and had expressed her willingness to be fair and impartial. Rowmond Brown argued that the prosecutor had shown a pattern of discrimination against educated [b]lack jurors.

The trial court found there was a reasonable inference that the prosecutor had exercised peremptory challenges based on race, sufficient to shift the burden to the prosecutor to justify his exercise of the challenges in a race-neutral fashion.

As to C.D., the prosecutor noted that she was 25 minutes late to court one morning, that she had her eyes closed or almost closed during most of the time the jurors were being questioned, that she did not consider her occupation as an airport security officer to be law enforcement, that her two sons had been arrested and prosecuted for criminal charges, that she had visited relatives in prison, and that she had at some point been a member of the NAACP, which the prosecutor characterized as an organization that was 'sympathetic to people who are charged with criminal offenses and have been coming through the criminal justice system, a system that they are actively trying to reform.'

K.H., the prosecutor pointed out, had lived for the past 30 years in Berkeley, which he said many people consider 'probably the most liberal city in the United States.'  K.H. was politically active in Berkeley, was a member of the Berkeley School Board, and had been a legislative aide for the City of Berkeley.  She was also City Clerk and Assistant to the City Manager of the City of Emeryville.  In response to a question about whether she had political aspirations, she had replied something to the effect of, 'Never say never.'  The prosecutor did not believe someone who was involved in Berkeley politics and who might have further political aspirations was likely to be a 'very good prosecution oriented juror.'  He was also concerned about K.H.'s membership in a number of organizations, including the National Women's Political Caucus; United In Action, which K.H. had characterized as an umbrella organization of 'organizations that [ ] either represent communities of color or other groups that are interested in improving [education],' and the NAACP, which the prosecutor

---

[3] In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion under *People v. Wheeler*, 22 Cal.3d 258, 280 (1978).

characterized as 'actively tr[ying] to promote change and reform in the criminal justice system on behalf of its members and on behalf of people who are [ ] African–American.'

As to F.P., the prosecutor expressed two concerns.  First, his brother was currently awaiting trial in a murder case.   Second, he had founded a program dedicated to 'getting kids off the street,' and when some of the youths had been arrested, he had visited them in jail to support them.

A.C., the prosecutor noted, had worked in the past for the State Public Defender, and had answered telephone calls from defendants.  She had worked for the Department of Fair Education and Housing, for the Department of Health Services, and as an adolescent group home counselor.  The prosecutor acknowledged that this work was admirable, but said that in his experience, people who did that sort of work tended to feel sympathy for people charged with crimes.  Moreover, A.C. had been arrested for purse snatching and placed on probation as a juvenile, and had on another occasion — which she did not mention in the jury questionnaire — been arrested by the Oakland Police Department and jailed.  He did not believe she would be favorable to the prosecution.  The prosecutor also noted that at the completion of jury selection, three of the 12 seated jurors were African–American.

In response, defense counsel pointed out that a white juror, juror number 13, who had been engaged in outreach work had not been excused, and that another juror who had been born in Berkeley had been seated on the jury without questions about her residency.  The prosecutor responded that he had concerns about whether juror number 13 would be a favorable prosecution juror, but that she was an alternate.  Furthermore, at the time juror number 13 was seated there were only 18 potential jurors remaining on the panel, and defendants had 13 challenges remaining; the prosecutor was concerned that defense counsel might excuse any remaining jurors who were more favorably disposed toward the prosecution.  As to A.C., he noted that race was likely to be a factor in the case, and A.C.'s work for Fair Employment and Housing included limited investigations into whether discrimination had occurred, leading him to think she would be more sympathetic to the defense than to the prosecution.  As for the seated juror who had been born in Berkeley, her juror questionnaire indicated she had lived in Hayward for 30 years, distinguishing her from K.H., who was not only a resident of Berkeley but was politically active there.

The trial court denied the *Batson/Wheeler* motions.  It noted that the prosecutor was obliged only to offer a genuine, reasonably specific, race- or group-neutral explanation of a suspect excusal, and that jurors may be excused based on trivial reasons or hunches, or even arbitrarily, so long as

10

the decisions are not based on impermissible group bias. [Citations omitted.]

Although C.D. was not the subject of a *Batson/Wheeler* motion, the trial court discussed her exclusion as part of the totality of the circumstances. The court noted that she was nearly half an hour late on the first morning, and offered no excuse.  It also appeared to the court that she was dozing off throughout the jury selection process.  Moreover, her two sons had been arrested and prosecuted for drug offenses in Alameda County, then went to state prison.  She had also visited relatives in prison, including a former brother-in-law who had been jailed for robbery.

Discussing the exclusion of K.H., the trial court noted that even if it were based only on her Berkeley residence, that would be a race-neutral reason. However, in addition K.H. was 'intensely involved' in both Berkeley and Emeryville politics, which the court considered a race-neutral reason for exclusion.  Moreover, she was a member of organizations whose positions generally supported those charged with crimes, also a race-neutral reason in the court's estimation.

As to F.P., the trial court noted that his brother was awaiting trial for murder, and concluded that this factor alone would justify excluding him. The court also agreed that while F.P.'s work coaching children and supporting those who went to jail was commendable, it might cause him to have sympathy and empathy with defendants.

As to A.C., the court noted that she had worked for the State Public Defender, which was dedicated to defending those charged with crimes, and with other agencies that worked with defendants, which the prosecutor could fear would lead her to have sympathy with defendants; this alone, in the court's view, would justify excluding her.  Moreover, she had not only been arrested as a juvenile for purse snatching, but had also been arrested on another occasion — one she omitted from the jury questionnaire — by the Oakland Police Department, which had investigated the murder of Anderson and arrested defendants.  The court found these reasons race neutral.

The trial court also noted that the prosecutor had conducted similar voir dire for all jurors, that the jury as seated included three African–Americans, and that the prosecutor had three times 'passed' his peremptory challenge when the jury contained three African–Americans.  The court also found the jurors to whom defense counsel had compared the excused jurors were not similarly situated.  The court concluded that the prosecutor was truthful about the reasons for exercising his peremptory challenges, and denied the *Batson/Wheeler* motions.

11

(Ans., Ex. L at 13–17.)

The state appellate court rejected Brown's Equal Protection claim on grounds that the record supported the trial court's determination that the prosecutor's reasons for his exclusions were credible, legitimate, and non-discriminatory:

> The record supports the trial court's decision.  K.H.'s background, including her status as an elected member of Berkeley's school board, could reasonably lead the prosecutor to believe her views might not be favorable to the prosecution.  Defendants do not contend that residence in Berkeley, and involvement in the politics of that city, are a proxy for race, and nothing we are aware of would support such an assumption.  (Compare *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 822, 825–826, overruled on another ground in *United States v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1167 [improper to base challenge on juror's residence in city heavily populated by low-income African–Americans rather than on juror's own attitudes].)  The trial court could properly conclude the prosecutor's proffered race-neutral reasons for excusing K.H. were genuine.
>
> We recognize that one of the reasons the prosecutor gave for excusing K.H. was her membership in the NAACP, among other organizations, a reason he had also given for excusing C.D., who had been a member of the NAACP for a short period in the 1970s.  FN20[.]  The expressed basis for his concern, however — his belief that the NAACP actively tried to promote reform in the criminal justice system and that its members might not be favorably disposed toward the prosecution in a criminal case — was not inherently connected to the race of the prospective juror, and was not implausible.  [Footnote and citation omitted.]  Furthermore, the other reasons he proffered — that she was politically active in a liberal city, that she was a public official, and that she had not ruled out further political aspirations — were race neutral and plausible.
>
> FN20. The prosecutor's challenge of C.D. was not the subject of a *Batson/Wheeler* motion, although the trial court considered it as part of the totality of the circumstances. Her lateness, inattentiveness in court, and the criminal record of at least three members of her family provided ample race-neutral justification for excusing her.
>
> The fact that the prosecutor did not challenge two other African–American jurors who were members of the NAACP does not change our view.  One of the two had worked in security management after retiring from the Navy, and was a member of a neighborhood watch group.  Although he had a son who had been briefly jailed 15 or 16 years previously, the prosecutor could

reasonably have concluded from his background in the military, his work in security, and his involvement in neighborhood watch, that he was likely to be a favorable juror.   [Citation omitted.]   The other juror who was a member of the NAACP was a nurse who had worked with trauma victims, and had seen a lot of violence in her career.   Asked her opinion of the criminal justice system, she stated that it was a "hard task," noted Oakland's high murder rate, and said that she thought the system treated people fairly. The prosecutor could reasonably have concluded that her background as a whole did not suggest she would favor defendants.   Thus, a comparison of these jurors with K.H. and C.D. shows they are not similarly situated.   [Citation omitted.]

The trial court could similarly accept the prosecutor's expressed reasons for excusing F.P., whose brother was awaiting trial in a murder case.   "The arrest of a juror or a close relative is an accepted race-neutral reason for exclusion."   [Citation omitted.]   Nor was it unreasonable for the trial court to accept at face value the prosecutor's expression of concern that F.P .'s work with young people who had been jailed might lead him to sympathize with defendants in a criminal case.   These reasons, too, were race neutral.

Defendants contend the prosecutor's concern with the fact that F.P.'s brother was awaiting for trial for murder was a sham, pointing out that the prosecutor did not challenge a white juror who had checked the "yes" box to the question, "Have you or a close friend or relative ever been accused of, arrested for or prosecuted for a crime?"   The questionnaire contained no elaboration of this answer, and the prosecutor did not ask the juror any questions about it.   Assuming this omission was deliberate and not an oversight, this juror had worked as a police technician for years.   As part of her responsibilities, she had worked in booking and as a dispatcher.   This background as a whole might reasonably be seen to suggest the juror would be favorably disposed toward the prosecution.   A comparison of this juror with F.P. shows they are not similarly situated, and there is no basis to conclude that the prosecutor's stated reasons for excusing F.P. were a sham.

A.C., as the prosecutor pointed out, had not only been placed on probation as a juvenile for purse snatching, but had neglected to mention on her jury questionnaire that on another occasion she had also been arrested by the Oakland Police Department and jailed.   Her own experience with being arrested and incarcerated, including an arrest by the same police department that investigated the crimes in question here, was a race-neutral reason for exclusion that the court could reasonably accept.   Likewise, the court could accept the prosecutor's explanation that he was concerned that A.C.'s work for the State Public Defender might indicate she would not be favorable to the prosecution.

. . . .

13

1

2

3

> Thus, we conclude the record contains substantial evidence to support the
> trial court's conclusion that defendants did not prove purposeful
> discrimination.  [Citation omitted.]

4

(Ans., Ex. L at 18–21.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

      The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race.  *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  *Batson* permits prompt rulings on objections to peremptory challenges pursuant to a three-step process. First, the defendant must make out a prima facie case that the prosecutor has exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Id.* at 93–94.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195.  A federal habeas court need not dwell on the first step of the *Batson* analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot."  *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

21

22

23

24

25

26

27

28

      In evaluating an explanation of racial neutrality, the Court must keep in mind that a proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause, *see Hernandez*, 500 U.S. at 355–62, and that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility, *Rice v. Collins*, 546 U.S. 333, 340–42 (2006).  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004).  A legitimate reason "is not a

United States District Court
Northern District of California

reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially-neutral explanation, not "the reasonableness of the asserted nonracial motive." *Id.* "To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (internal quotation marks and citation omitted).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, *see Elem*, 514 U.S. at 769, as are the findings of the state appellate court, *see Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means that a state court's findings of discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[W]e must defer to the [California Court of Appeal's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010) (internal quotation marks and citation omitted). A federal habeas court may grant habeas relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338–41.

Applying these legal principles to the instant matter, the Court concludes that Brown has not rebutted the presumption that the state court's conclusion was a reasonable one, *see Miller-El*, 545 U.S. at 240, as the following analysis shows. The Court need not dwell on the first step of the *Batson* analysis, whether Brown made a prima facie case,

15

1   because (a) the prosecutor offered racially-neutral explanations for striking the jurors, and

2   (b) the trial court ruled on the ultimate question of intentional discrimination.

3         With respect to the second *Batson* step, the record does not support Brown's

4   assertion that the prosecutor's decisions were based on constitutionally offensive

5   considerations.  As the state appellate court reasonably found, the prosecutor's stated

6   legitimate, non-discriminatory reasons for the peremptory challenges against K.H., F.P.

7   and A.C. were supported by the record.  The record shows that K.H. had strong political

8   beliefs, as evidenced by her long-term involvement in Berkeley politics and her

9   associations with several political and social-reform organizations such as the NAACP.

10  Evidence of strong political beliefs could lead a prosecutor to think that K.H. may be

11  biased, and therefore unable to adhere to a juror's oath to be fair and impartial.  Striking a

12  juror for membership in the NAACP does not alone demonstrate a *Batson* violation.  *See*

13  *United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir. 1992).

14        Similarly, evidence that a prospective juror's close family member was facing trial

15  could lead a prosecutor to reasonably believe that the prospective juror may well be biased

16  against the courts or law enforcement.  The record shows that F.P.'s brother, with whom

17  F.P. stated he had a good relationship and to whom he was close (Ans., Ex. B, Vol. 4 at

18  381), was awaiting trial for murder and worked with children who had been arrested, even

19  visiting them in jail.

20        A.C. had worked for a public defender, and had herself been arrested and spent time

21  in jail and on probation.  She had been arrested and jailed by the same police department

22  that investigated the Anderson and Thompson killings.  (*Id.* at 617.)  Evidence that a

23  prospective juror had a negative history with law enforcement, both personally and

24  professionally, could lead a prosecutor to reasonably believe that such person might well

25  be biased against the courts or law enforcement.

26        The third *Batson* step involves a query whether there was intentional discrimination.

27  Here, petitioner Brown has not shown clear and convincing evidence to rebut the

28  presumption that the trial court's determination was correct, or shown why this Court

United States District Court
Northern District of California

16

should favor Brown's interpretation of the record over the trial court's credibility determination.

A comparative juror analysis, which was conducted by the state appellate court in its review of petitioner's claims, further supports this conclusion.  The record supports the state appellate court's conclusions that the seated jurors were not in truth similarly situated to the excluded ones.  Juror 13 had "done outreach work," but there was no evidence that Juror 13 had, unlike A.C. and F.P., a negative history with law enforcement.  Also, Juror 13, who was a health-care policy research analyst, performed social work of a different sort.  She was involved with community health care, e.g., helping people complete medical insurance forms and performing dental and vision screening for children.  (Ans., Ex. B, Vol. 5 at 824.)  The seated juror who had been born in Berkeley was not similarly situated to K.H.  That juror lived in Hayward, and there was no evidence that she had strong political views and heavy involvement in political and social reform movements.  Also, this juror's son worked as a correctional officer for both the San Leandro Police Department and the Oakland jail.  (*Id.*, Vol. 4 at 396.)  The record also supports the determination that seated jurors who, like K.H., were members of the NAACP, were not similarly situated.  One of these jurors had been in the military, "worked in security," and was part of a neighborhood crime watch group.  These factors, unpossessed by K.H., would counter the unease the prosecutor may have felt about the juror's membership in a political and social reform organization.  The other juror's first-hand experience of victims of violence, her concern over murder rates, and her stated belief that the system treats people fairly are factors that distinguish this juror from K.H. and relate directly to a prosecutor's concerns about bias against the criminal justice system.

The record also shows differences between F.P. and the seated white juror who had said "yes" to the question whether a close friend or relative had a negative history with law enforcement.  The seated juror had worked in law enforcement as a police technician, a fact that places this juror in a different light than F.P., and bears directly on the issue of bias.

The state appellate court's determination is also bolstered by the circumstances surrounding C.D.'s exclusion. C.D., whose exclusion was not the subject of a defense objection, (1) had been late to court and appeared to not pay attention to the proceedings; (2) had two sons who had been arrested, prosecuted, and convicted of criminal offenses in the same county as the Anderson killing, and had a brother-in-law who had been jailed for robbery; and (3) was a member of the NAACP at one time. (Ans., Ex. A, Vol. 10 at 362; Ex. B, Vol. 1 at 161-62.) These facts are consistent with the prosecutor's reasons for the other exclusions: a negative history with law enforcement, indications that she could not discharge her duties as a juror (e.g., sleepiness and lateness), and an association with a political organization — all of these without some counterbalancing factor such as those possessed by the seated jurors.

Taking all this into account, the Court concludes that petitioner Brown has not shown that his constitutional rights were violated, or that the state appellate court's decision was anything other than "plainly not unreasonable." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011). At a minimum, Brown's claim must be denied because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011), that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d). Accordingly, this claim is DENIED.

## IV.   Prosecutorial Misconduct Claim

Brown claims that the prosecutor knowingly presented false testimony. At trial, prosecution witness Jeffrey Bunn testified under a grant of immunity:

> During his testimony, [Bunn] said on multiple occasions that he believed his grant of immunity covered perjury he committed while testifying, although he later stated that he did not believe this was the case. He acknowledged, however, having committed numerous acts of perjury during the course of his trial testimony. During cross-examination, this exchange occurred: 'Q. You have no concern about lying under oath do you? [¶] A. No. [¶] Q. None whatsoever? [¶] A. Nope.' FN30[.]

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

FN30. Bunn testified over the course of three days, and both the second and third days of his testimony expressed his view that he had immunity for lies he told at trial. After a recess on the final day of his testimony, he testified that he did not think he was immune for perjury committed at trial. Defense counsel then asked Bunn whether he had spoken with the prosecutor between the time he testified on the previous day and when he came back to testify on the third day, and Bunn said he had not done so. Bunn also denied having spoken with the prosecutor about his testimony at any point after he left the stand on the second day of his testimony. The prosecutor later told the court that during morning recess that day he had spoken with Bunn about the importance of telling the truth, that he had asked Bunn if he was willing to testify that he knew the defendants, and that Bunn had said he would do so.

10

11

12

13

14

15

(Ans., Ex. L at 49.)  The state appellate court rejected Brown's claim that the trial court should have stricken Bunn's testimony:  "The record does not indicate that Bunn lacked the *ability* to testify truthfully.  His numerous instances of lying and perjury presented the jury with a question of credibility, but do not show he was incompetent."  (*Id.* at 50.)  On collateral review, Brown amplified this claim to include allegations that the prosecutor knowingly presented false testimony.

16

17

18

19

20

21

22

When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  To prevail on such a claim a petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).

23

24

25

26

27

28

Habeas relief is not warranted here.  Brown has not shown that the prosecutor knew that the testimony was false.  Rather, the record shows that when the prosecutor discovered that Bunn may have been untruthful, he instructed Bunn to tell the truth, and asked him whether he could testify truthfully.  When the prosecutor told the trial court this, none of the defense attorneys questioned his veracity or objected in any way.  (Ans., Ex. 17 at 2344.)  The trial court later stated to defense counsel that he found the prosecutor's

adherence to his obligations "scrupulous." (*Id.* at 2349.)  During his direct examination of Bunn, the prosecutor took care to point out when Bunn's testimony contradicted prior statements, and when he had been untruthful.  (*Id.*, Ex. 16 at 2077-78.)  While the prosecutor may have presented an unreliable witness, there is no evidence that he knowingly presented false testimony.  On such a record, there is no indication that the prosecutor knowingly presented false testimony, or otherwise committed misconduct.

Nor is habeas relief warranted on his related claim that the trial court should have stricken Bunn's testimony.  As the state appellate court noted, the jury was aware of Bunn's lack of truthfulness and could evaluate the believability of his testimony accordingly.  (Ans., Ex. L at 49.)  The state appellate court's rejection of this claim was reasonable, and is therefore entitled to AEDPA deference.  Accordingly, this claim is DENIED.

## CONCLUSION

The state court's adjudication of Brown's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:**  December 4, 2014

WILLIAM H. ORRICK
United States District Judge